**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**RYAN P. CREWS,**

**Plaintiff,**

**v.**                                                    **No. 06-1012-DRH**

**CITY OF MT. VERNON, a Municipal
Corporation; CHRIS DEICHMAN,
individually and in his capacity as Assistant
Chief for the City of M. Vernon; and CHRIS
MENDENALL, individually and in his capacity
as Chief of Police for the City of Mt. Vernon,**

**Defendants.**

## <u>MEMORANDUM and ORDER</u>

**HERNDON, Chief Judge:**

### I.  <u>Introduction and Background</u>

Now before the Court are cross motions for summary judgment filed by the parties (Docs. 67 & 69).  Both motions are fully briefed and ripe for ruling. Based on the pleadings, case law and the following, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.

On December 21, 2006, Ryan Crews filed a First Amended Complaint against the City of Mt. Vernon, Chris Deichman, and Chris Mendenall, for alleged violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301 *et seq* (Doc. 8).[1]  Crews is a member of the Illinois

---

[1]Crews filed his Original Complaint was filed on December 11, 2006 (Doc. 1).

Army National Guard ("Guard") and is also a Police Officer for the City of Mt. Vernon, Illinois. The First Amended Complaint alleges that in order to fulfill his obligations to the Guard, Crews is required to attend periodic training exercises ("drills") for one weekend per month. Crews further alleges that "[c]ity employees participating in the National Guard frequently are ordered for drill on days that are not the employee's regularly scheduled days off." (Doc. 8, ¶ 11). The First Amended Complaint also alleges that Defendants "has had a policy, plan and practice that employees who are members of the National Guard could switch their schedules in order to work their regular days off in lieu of the regularly-scheduled days on which they had to attend drill." (Doc. 8, ¶ 11). Crews contends that this policy is a benefit of employment under the USERRA , 38 U.S.C. § 4303. Crews further alleges that on August 16, 2006, Defendants rescinded the policy of allowing its employees to work their regularly-scheduled days off in place of days they were required to attend drill. Crews alleges that the decision to rescind this policy is based on discrimination and in retaliation in violation of USERRA, 38 U.S.C. § 4311(c). The First Amended Complaint seeks to recover "benefits" of his employment, attorney's fees and costs, and injunctive and equitable relief.

## II. Facts

Since 1997, Crews has been employed by the City of Mt. Vernon as a Police Officer. From 1997 to May 2006, he was a Patrol Officer in the Patrol Division. In May 2006, the City of Mt. Vernon promoted Crews to Corporal in the Patrol Division. Crews has been a member of the Guard since 1998 and is a

member of the uniformed services. As part of his Guard duties, Crews is required to attend drill exercises about once a month.

Defendant Mendenall is the Chief of Police. He has been the Chief since 1998 and has been employed as a police officer with the City since 1983.

Defendant Deichman is the Assistant Chief of Police. He has been the Assistant Chief since 2004 and has been employed as a police officer with the City since 1989.

In February 2003, Crews was called to active duty in Iraq. He completed that tour of duty in May 2004. Thereafter, Crews was again deployed to Iraq in January 2005 and completed that tour of duty in April 2006. After each deployment, Crews was honorably discharged from active duty and returned to his employment with the City.

As a member of the patrol division, Crews regularly is scheduled to work five, eight hour days each week, with two days off of work. Scheduled days off are designed to assure that at least one patrol supervisor is working each day. Due to his Guard obligations, Crews is often ordered for drill exercises on days that are not his regularly scheduled days off.

Employees are allowed to use vacation days, personal days, or compensatory time to cover for any scheduled working days required for military leave so that such days off may be paid. No employees are permitted to work their scheduled days off to make up for days off taken for outside activities or needs. Employees can arrange for a duty trade with another officer when they both agree to

switch shifts.  Any City employee who is ordered to drill exercises on scheduled working days may turn in military pay from the Guard and receive regular City pay.[2]

Prior to August 2006, the City and Chief Mendenall allowed Crews and other employees who were a part of the Guard to work their scheduled days off in lieu of their regularly scheduled work days when drill exercises fell on their regularly scheduled work days.[3]  Prior to August 2006, the City hired five additional Guard members as Policemen.  At or around August 2006, the City decided to no longer allow Crews and the other employees in the Guard to work their regularly scheduled days off in lieu of the days they were off for drill exercises.  Since then, Crews has not been permitted to work his scheduled days off unless he is called in for overtime to cover a shift.

### III.  <u>Summary Judgment</u>

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  **Fed. R. Civ. Proc.**

---

[2]Since Crews' military pay for drill exercises surpasses his City pay, Crews does not turn in his military pay.

[3]After completing his initial training, Crews raised with his then supervisor, Captain David Keen, how the conflict between his police schedule and drill would be handled.  Keen discussed this with then Chief Massey and Keen replied to Crews by a June 23, 1997 memorandum.  The memorandum states in part: "In regards to your obligations to the National Guard, I have discussed this with Chief Massey and his is agreeable that you may use the monthly weekend drills as your days off for that week with no loss of pay."  (Doc. 67-6).  Chief Massey left the Police Department in early 1998 and was succeeded by Chief Mendenall.

**56(c)**.  A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant.  *Buscaglia v. United States,* **25 F.3d 530, 534 (7th Cir. 1994)**.  The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial.  **Fed. R. Civ. Proc. 56(e);** *Celotex Corp. v. Catrett,* **477 U.S. 317, 325 (1986)**.  In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242, 255 (1986)**.

When parties file cross motions for summary judgment, each motion must be assessed independently, and denial of one does not necessitate the grant of the other.  *M. Snower & Co. v. United States,* **140 F.2d 367, 369 (7th Cir.1944)**.  Rather, each motion evidences only that the movant believes it is entitled to judgment as a matter of law on the issues within its motion and that trial is the appropriate course of action if the court disagrees with that assessment.  *Miller v. LeSea Broadcasting, Inc.,* **87 F.3d 224, 230 (7th Cir. 1996)**.  With these principles in mind, the Court turns to the parties' motions.

## IV.  <u>Analysis</u>

"USERRA prohibits discrimination by, among other things, denying any benefit of employment on the basis of the employee's membership in the uniformed

services." ***Miller v. City of Indianapolis*, 281 F.3d 648, 650 (7th Cir. 2002)**.

USERRA enacted in 1994, is the most recent in a series of laws protecting veterans'

employment and reemployment rights dating from the Selective Training and Service

Act of 1940. ***Rogers v. City of San Antonio*, 392 F.3d 758, 762 (5th Cir. 2004),**

**cert. denied, 545 U.S. 1129 (2005)**.   USERRA's immediate precursor was the

Veterans' Reemployment Rights Act ("VRRA"). ***Rogers*, 392 F.3d at 762**. Congress,

in enacting USERRA, emphasized: (1) USERRA's continuity with the VRRA and its

intention to clarify and strengthen that law; (2) Federal law protecting veterans'

employment and reemployment rights for the past fifty years had been successful;

and (3) the "large body of case law that had developed under those statutes remained

in full force and effect, to the extent it is consistent with USERRA." ***Rogers*, 392

F.3d at 762**.

   38 U.S.C. § 4311(a) provides in part:

> A person who is a member of, applies to be a member of, performs, has
> performed, applies to perform, or has an obligation to perform service
> in a uniformed service shall not be denied … any benefit of employment
> by an employer on the basis of that membership, application for
> membership, performance of service, application of service or
> obligation.

**38 U.S.C. § 4311(a)**.   An employer is considered to have engaged in actions

prohibited under 4311(a) if, among other things, a person's "membership" or

"obligation for service in the uniformed services" is a "motivating factor in the

employer's action, unless the employer can prove that the action would have been

taken in absence of such membership ... or obligation for service." ***Yates v. Merit Sys. Protection Bd.*, 145 F.3d 1480, 1483 (Fed. Cir. 1998), citing 38 U.S.C. § 4311(c)(1)**.

A "benefit of employment" is broadly defined to include "any advantage, profit, privilege, gain, status, account or interest (other than wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan or practice and includes rights and benefits under a pension plan, a health plan, an employee stock plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." **38 U.S.C. § 4303(2)**. "This language makes clear that the 'benefit of employment' that cannot be lawfully deprived by an employer is one that flows as a result of the person's employment by the employer in question." ***Thomsen v. Dep't of the Treasury*, 169 F.3d 1378, 1381 (Fed. Cir. 1999)**.

First, Crews argues that Defendants violated USERRA in deciding in August 2006 to discontinue a previous policy, plan or practice under which Guardsmen employed in the City's Police Department could switch their schedules during weeks when they had required Guard drill, working their regularly scheduled days off in lieu of regularly scheduled shifts which they had to miss because of drill. Crews further argues that there is no dispute that Defendants made a deliberate decision to discontinue the Policy.

Defendants contend that this is not a policy or a benefit covered under the USERRA as the City was not required to provide Crews greater scheduling flexibility than those on similar non-military leaves of absences. Defendants maintain that nothing in the USERRA requires employers to provide greater benefits to employees on service-related leave than are provided to other employees on non-military leave or furlough. Defendants also contend that there is no mandate that once any particular benefit, policy or practice is in place, that it must be maintained indefinitely. Defendants further maintain that the legal precedent and legislative history of USERRA make it clear that USERRA is intended to provide only equal, not preferential, treatment for those taking military leave. The Court agrees with Defendants.

Under the USERRA, the general rule is that an employee who is absent for military reasons, including a reservists' short absences from civilian employment for drill obligations, not just tours of active duty, is entitled to non-seniority benefits equal to those employees taking comparable non-military leaves of absences. ***Rogers*, 392 F.2d at 760-61**. Defendants argue and the Court agrees that Crews cannot recover since he was treated equally to such rights with all employees absent on non-military leaves of absences.

USERRA section 4316(b)(1) states:

[A] person who is absent from a position of employment by reason of service in the uniformed services shall be-
(A) deemed to be on furlough or leave of absence while performing such service: and
(B) entitled to such other rights and benefits not determined by

seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice or plan in effect at the commencement of such services or established while such person performs such service.

**38 U.S.C. § 4316(b)(1)**.  Section 4316(b)(1) contains no specific language to indicate that Congress imposed a requirement on employers to provide a special work schedule for employee-reservists not generally granted to other employees.  The House Report on the bill that became § 4316(b)(1) states:

> The Committee intends to affirm the decision in *Waltermyer v. Aluminum Co. of America*, 804 F.2d 821 (3d Cir. 1986) that, to the extent the employer policy or practice varies among various types of non-military leaves of absence, the most favorable treatment accorded any particular leave would also be accorded the military leave, regardless of whether the non-military leave is paid or unpaid.  Thus, for example, an employer cannot require servicemembers to reschedule their work week because of a conflict with reserve or National Guard duty, unless all other employees who miss work are required to reschedule their work. *Cf. Rumsey v. New York State Dept. of Corr. Services*, 124 L.R.R.M. 2914, 1987 WL 11617 (N.D.N.Y. 1987). **However, servicemembers are not entitled to receive benefits beyond what they would have received had they remained continuously employed.**

**H.R. Rep. 103-65 (I) (April 28, 1993) (emphasis added)**.  Thus, the legislative history "necessarily indicat[es] an intent to codify *Monroe's* 'equal, but not preferential' interpretation of VRRA § 2021 (b)(3) which was adopted and followed by *Waltermyer*." ***Rogers*, 392 F.3d at 768**.

Crews' argument that he be able to work regularly-scheduled days off in lieu of scheduled shifts which he had to miss due to drill obligations would require special work-scheduling preferences not generally available to non-military

employees.  When reading § 4316 (b)(1) together with § 4311(a) and other USERRA provisions, the legislative history, and preceding statutes, it appears that Congress did not intend that employers be required "to provide a special work-scheduling preference.  Indeed, the legislative history, set out above, strongly suggests that Congress did not intend employers to provide special benefits to employee-reservists not generally made available to other employees."  ***Monroe v. Standard Oil Company*, 452 U.S. 549, 561 (1981)**.  The U.S. Supreme Court in ***Monroe*** further noted, "The legislative history is barren of any indication that Congress intended employers to compensate employees for work hours missed while fulfilling military reserve obligations, which would of course amount to employee receipt of **double compensation for such periods**." ***Id.* at 562, FN 13 (emphasis added)**.

In ***Monroe***, the Supreme Court pointed out that under the VRRA, the predecessor statute to the USERRA, that:

> The Veterans' Reemployment Rights Handbook, published by the Office of Veterans' Reemployment Rights in 1970 and still in use today, notes that '[t]he law does not require the employer to pay the employee for the time he is absent for military training duty, or even to make up the difference between his military pay and his regular earnings for that period.  In this respect, of course, many employers have adopted voluntary policies or contractual obligations, or are subject to State statutes, which give reservists and guardsmen more than the statute [38 U.S.C. § 2021 *et seq.*] requires.' *Id.*, at 113.  And in the many examples in the Handbook addressed to typical problems an employer may confront because of employee military obligations, there is not so much as a hint that an employer has an obligation to adjust an employee's work schedule to make up for time lost because of military obligations.

***Id.* at 563, FN 14**.  It seems that if Congress wanted to require employers to make

work schedule accommodations for employee-reservist, it would have done so expressly. There is no proof, however, that Congress enacted § 4316 (b)(1) to deal with the problem of missed work hours because of drill obligations. If this Court were to find that the USERRA requires the Defendants to provide special work-hour scheduling for Crews and other military reservists, then it would impose preferential treatment, not equal treatment, upon military reservists. Both **Rogers** and **Monroe** hold that "equal, but not preferential" treatment is what is required under USERRA's § 4316 (b)(1).[4]

Further, Defendants argue that they are entitled to summary judgment on Crews' retaliation claim. The Court finds that Crews has not met the standard for his retaliation claim. Crews argues that after he challenged the decision to discontinue allowing him to work his scheduled days off in lieu of the days he had weekend drill duty, he was retaliated against by being denied the opportunity to go to Field Training Officer ("FTO") classes, that Defendants made unwarranted negative comments about him and that he received in one quarterly evaluation a low mark in the area of "attitude" toward Assistant Chief Deichman. Defendants contend that this is insufficient to withstand summary judgment.

The USERRA also prohibits employers from taking "any adverse action

---

[4]The Seventh Circuit, in applying **Monroe**, reaffirmed the principle that federal military leave law "did not entitle reservists to any benefits beyond those available to non-reservist employees." **Perez v. School of Hammond, 24 F.3d 889, 901 (7th Cir. 1994)(ordering district court to dismiss pursuant to Rule 12(b)(6) claim for extra benefits for reservists);** *Pignato v. American Trans Air, Inc.,* **14 F.3d 342 (7th Cir. 1994)(affirming judgment for employer where employee-reservist sought special work scheduling preferences not available to other non-military employees)**.

against any person because such person ... has exercised a right provided for" under USERRA. **38 U.S.C. § 4311(b); *See also Clegg v. Arkansas Dept. of* Correction, 496 F.3d 922 (8th Cir. 2007); *Gagnon v. Sprint Corp.*, 284 F.3d 839, 853 (8th Cir. 2002)(stating that this section sets out the standard for retaliation claims under USERRA)**.

To be actionable, there must be an employment action, and it must be "materially" adverse, meaning more than "a mere inconvenience or an alteration of job responsibilities." *Ribando v. United Airlines, Inc.,* **200 F.3d 507, 511 (7th Cir. 1999)**. As the Seventh Circuit has explained, "a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* While the definition of an adverse employment action is not limited to a loss of salary or benefits it is not so broad as to include "everything that makes an employee unhappy."" *Smart v. Ball State University,* **89 F.3d 437, 441 (7th Cir. 1996)**. In other words, the adverse action must *materially* alter the terms and conditions of employment. *O'Neal v. City of Chicago,* **392 F.3d 909, 913 (7th Cir. 2004)**; *Place v. Abbott Labs.,* **215 F.3d 803, 810 (7th Cir. 2000)**.

The Court finds that these instances are not material and do not constitute an adverse employment action. After reviewing Crews' allegations and the

record, there is insufficient evidence to demonstrate that an adverse action or a denial of a benefit of employment has occurred in this case. As to the training, the record reveals the City never approved a member of the "brass" (i.e., Captain, Sergeant, or Corporal to go to FTO classes. FTOs are those regular members of the Police Department who are responsible for assisting new, probationary police officers when them come on to Police Department. Further, the record reveals that Crews was sent to classes in 2006 and 2007 consistent with his duties as a Corporal, including "first line leader" and critical incident management" and that he has been encouraged to obtain at least 30 hours outside training per year. Further, the Court finds that the negative evaluation Crews received cannot be considered to implicate a sufficient "tangible job consequence[]" so as to constitute liability. **See Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998)("Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them."); Roney v. Illinois Dept. of Transportation, 474 F.3d 445, 461-462 (7th Cir. 2007).** These instances fall short of the adverse action required to satisfy the prima facie case of retaliation.

## V.  <u>Conclusion</u>

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment (Doc. 69) and **DENIES** Plaintiff's motion for summary judgment (Doc. 69). The Court **ORDERS** the Clerk of the Court to enter judgment in favor of Defendants and against Plaintiff.

**IT IS SO ORDERED.**

Signed this 23rd day of May, 2008.


/s/      *David R Herndon*
**Chief Judge**
**United States District Court**